IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MATTHEW ZWIEBEL                  :           CIVIL ACTION
                                 :
        v.                       :
                                 :           NO. 19-1962
ANDREW SAUL, Commissioner        :
of Social Security[1]            :

**MEMORANDUM AND ORDER**

ELIZABETH T. HEY, U.S.M.J.                                  April 30, 2020

Matthew Zwiebel ("Plaintiff") brought this action pursuant to 42 U.S.C. § 405(g)

to review the Commissioner's final decision denying in part his applications for disability

insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and

XVI of the Social Security Act.  For the reasons that follow, I conclude that the decision

of the Administrative Law Judge ("ALJ") is not supported by substantial evidence.

Moreover, because adjudication of this matter has been unduly delayed, and because the

administrative record has been fully developed and indicates that Plaintiff was disabled

during the relevant period, I will remand with instructions that benefits be paid.

I.      **PROCEDURAL HISTORY**

Plaintiff's applications have a protracted history.  He applied for DIB and SSI on

October 10, 2008, alleging disability beginning on June 1, 2006.  Tr. at 157, 164, 180.[2]

---

[1]Andrew Saul became the Commissioner of Social Security ("Commissioner" or
"Defendant") on June 17, 2019, and should be substituted for the former Acting
Commissioner, Nancy Berryhill, as the defendant in this action.  Fed. R. Civ. P. 25(d).

[2]Plaintiff's date last insured is March 31, 2010, requiring him to establish that he
became disabled on or before that date to qualify for DIB.  Tr. at 180.  Because Plaintiff

The applications were denied initially, id. at 134-43, and Plaintiff requested an administrative hearing before an ALJ, which took place on June 16, 2010.  Id. at 36-105.[3]  The ALJ issued an unfavorable decision on September 22, 2010.  Id. at 18-35.  The Appeals Council ("AC") denied Plaintiff's request for review on August 9, 2012, id. at 1-4, making the ALJ's September 22, 2010 decision the final decision of the Commissioner for purposes of appeal to federal court.  Plaintiff commenced an action in this court on October 15, 2012, docketed at Civil Action No. 12- 5843, and on March 23, 2013, the late Honorable Stewart Dalzell granted the Commissioner's unopposed motion to remand the case for further administrative review.  Id. at 840-42.

On April 24, 2013, the AC remanded with instructions that the ALJ, among other things, evaluate third-party testimony and the treating source opinion of Gabriel Ruggiero, D.O.  Tr. at 882-86.  The same ALJ conducted a second hearing on January 10, 2014, id. at 718-54,[4] and issued a second unfavorable decision on February 21, 2014.  Id. at 849-66.  On March 17, 2015, the AC assumed jurisdiction and vacated the ALJ's decision, remanding for a hearing before a different ALJ and noting that the ALJ failed to consider the testimony of Plaintiff's father as instructed.  Id. at 873-77.

has received SSI benefits with an effective disability onset date of June 27, 2014, this appeal involves the period from his alleged onset date (June 1, 2006) through the effective disability onset date (June 27, 2014).

[3]The June 6, 2010 hearing transcript is reproduced three times in the administrative record.  Tr. at 36-105, 764-817 & 945-1014.  This transcript and other materials reproduced multiple times will be cited using their first appearance.

[4]The January 10, 2014 hearing was continued from October 11, 2013, when Plaintiff was unavailable because he was undergoing in-patient treatment.  Tr. at 757-58.

On October 27, 2015, a second ALJ conducted Plaintiff's third administrative hearing.  Tr. at 680-717.  On December 11, 2015, that ALJ issued a partially favorable decision, finding that Plaintiff was disabled as of June 27, 2014, but not before that date.  Id. at 888-901.  The AC again assumed jurisdiction, and on November 7, 2016, affirmed the second ALJ's finding that Plaintiff became disabled on June 27, 2014, but vacated the decision with respect to the issue of disability before that date, and remanded for another hearing.  Id. at 910-14.  In its remand order, the AC noted that the latest hearing decision did not comply with its prior orders, and instructed the ALJ to evaluate the treating source opinions, including those of Dr. Ruggiero, as well as third-party evidence of Plaintiff's parents.  Id. at 912, 914.

On October 5, 2017, a third ALJ conducted Plaintiff's fourth administrative hearing.  Tr. at 651-79.  On April 9, 2018, that ALJ issued the decision currently being appealed, finding that prior to June 27, 2014, Plaintiff was not disabled.  Id. at 619-40.  The AC denied Plaintiff's request for review, id. at 579-83, making the ALJ's April 9, 2018 decision the final decision of the Commissioner for purposes of the present action.  20 C.F.R. §§ 404.981, 416.1472.

Plaintiff commenced this action in federal court on May 6, 2019.  Docs. 1 & 2.  The matter is now fully briefed and ripe for review.  Docs. 11, 16 & 17.[5]

---

[5]The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  See Standing Order, In RE:  Direct Assignment of Social Security Appeal Cases to Magistrate Judges (Pilot Program) (E.D. Pa. Sept. 4, 2018); Doc. 7.

## II.   <u>LEGAL STANDARD</u>

The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence.  42 U.S.C. § 405(g); <u>Schaudeck v. Comm'r of Soc. Sec.</u>, 181 F.3d 429, 431 (3d Cir. 1999).  Therefore, the issue in this case is whether there is substantial evidence to support the Commissioner's determination that before June 27, 2014, Plaintiff was not disabled and could perform jobs that existed in significant numbers in the national economy.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and must be "more than a mere scintilla."  <u>Zirnsak v. Colvin</u>, 777 F.2d 607, 610 (3d Cir. 2014) (quoting <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 552 (3d Cir. 2005)).  The court has plenary review of legal issues.  <u>Schaudeck</u>, 181 F.3d at 431.

To prove disability, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for . . . not less than twelve months."  42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process, evaluating:

> 1.      Whether the claimant is currently engaged in substantially gainful activity;
>
> 2.      If not, whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities;
>
> 3.      If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the "listing of impairments," 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;

> 4.      If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform his past work; and

> 5.      If the claimant cannot perform his past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak, 777 F.3d at 610; see also 20 C.F.R. § 416.920(a)(4).  Plaintiff bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at the fifth step to establish that the claimant is capable of performing other jobs in the local and national economies, in light of his age, education, work experience, and RFC.  See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007).

## III.   **DISCUSSION**

Plaintiff was born on March 31, 1979, and thus was twenty-seven years of age at the time of his alleged disability onset date (June 1, 2006), thirty-one at the time of his date last insured (March 31, 2010), and thirty-five at his established disability onset date (June 27, 2014).  Tr. at 164, 180, 655.  He is six feet, two inches tall and weighs between approximately 211 and 240 pounds.  Id. at 183, 723.  During the period at issue (June 1, 2006, through June 26, 2014), Plaintiff first lived with his young son and the son's mother, and then after they split up, lived in different locations with his own mother and then his brother, seeing his son only on weekends.  Id. at 656, 659-60.  He completed the eleventh grade, took his General Equivalency Development ("GED") test, [6] and has no

---

[6] At his first hearing, Plaintiff testified that they somehow lost his GED test results, but that he thinks he "missed it just by a couple points."  Tr. at 44.  He later testified that he was unsure whether he passed the GED test.  Id. at 724.

specialized job training.  Id. at 189, 658.  He has prior work experience as a flooring

mechanic/installer.  Id. at 185, 658.

### A.      ALJ's Findings and Plaintiff's Claims

In the April 9, 2018 decision under review, the ALJ defined the period under

consideration as June 1, 2006, through June 26, 2014, and found at step one that Plaintiff

had not engaged in substantial gainful activity during that period.  Tr. at 624, 626.  At

step two, the ALJ found that Plaintiff had the following severe impairments; degenerative

disc disease ("DDD") in the cervical and lumbar spine; tendinitis in the right shoulder;

mild right carpal tunnel syndrome ("CTS"); mild chronic right C5 radiculopathy;

polysubstance dependence (opiate, amphetamine, and benzodiazepine); mood disorders;

and anxiety disorder, not otherwise specified ("NOS").  Id. at 626.  The ALJ next found

that Plaintiff did not have an impairment or combination of impairments that meets or

medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404,

Subpart P, Appendix 1.  Id. at 627.  The ALJ found that, prior to June 27, 2014, Plaintiff

retained the RFC to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and

416.927(a), with the following limitations: occasional reaching overhead bilaterally;

frequent reaching in all other directions; no crawling or climbing ladders, ropes or

scaffolds; occasional stooping, crouching, kneeling, and climbing ramps and stairs; no

exposure to unprotected heights or unprotected mechanical parts; simple routine tasks

with few if any workplace changes such that the same duties could be performed at the

same station or location from day to day; no contact with the general public and

occasional interaction with co-workers and supervisors.  Id. at 630.  The ALJ found that

Plaintiff was not able to perform any past relevant work, id. at 638, and that considering his age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform from June 1, 2006, through June 26, 2014.  Id. at 639.  As a result, the ALJ concluded that Plaintiff was not disabled during the relevant period.  Id. at 640.

Plaintiff argues that the ALJ's opinion is not supported by substantial evidence because the ALJ rejected medical opinion evidence and lay witness testimony pertaining to the relevant period without reasonable explanation.  Docs. 11 & 17.  Defendant counters that the ALJ's opinion is supported by substantial evidence.  Doc. 16.

### B. <u>Summary of the Medical Evidence</u>

The issue in this case is whether Plaintiff became disabled during the period between June 21, 2006, and June 26, 2014, and his claims are limited to consideration of his physical impairments.  Therefore, the summary of the medical evidence will be largely confined to Plaintiff's physical impairments for the closed period at issue, except where needed to provide context.

Plaintiff's treating physician, Gabriel Ruggiero, D.O., has been treating Plaintiff since 1998, tr. at 1428, including for residuals from motor vehicle accidents which occurred in January 2007,[7] November 2007, May 2008, and March 2009.  Id. at 216, 234, 320, 374, 1401-02.  In January 2007, following the first accident, Dr. Ruggiero noted that

_____

[7]In one medical history Plaintiff reported that the first accident occurred in January 2006, tr. at 216, but other records suggest it was January 2007.  Id. at 246, 320.

Plaintiff exhibited right shoulder pain and reduced range of motion, lumbar pain and reduced range of motion, and pain which radiated into his right leg, and prescribed naproxen.  Id. at 246.  On February 5, 2007, an MRI of Plaintiff's lumbar spine revealed right-side bulging of the disc at L5-S1 with right greater than left neural foraminal narrowing, and mild concentric bulging of the discs at the L3-4 and L4-5 levels.  Id. at 518.  Dr. Ruggiero continued to note Plaintiff's shoulder and lower back pain and reduced range of motion in follow-up visits throughout 2007, and continued Plaintiff on a conservative course of treatment including physical therapy and pain medication.  Id. at 247-51.  Plaintiff's symptoms had not resolved at the time of his second car accident in November 2007, after which Dr. Ruggiero noted ongoing complaints of pain and documented decreased range of motion.  Id. at 252-53.  Dr. Ruggiero prescribed Adderall[8] and ibuprofen during this period, id. at 514, and in March 2008 put physical therapy on hold.  Id. at 253.

On March 3, 2008, orthopedist Kenan Aksu, D.O., noted that examination of Plaintiff's lumbar spine "reveals tenderness and spasms predominantly on the right side." Tr. at 510.  A cervical MRI performed the following day revealed minor central bulging at both the C4-5 and C5-6 levels with minimal impingement upon the dural sac and no evidence of cord compression, and some diffuse bulging of the disc at the C6-7 level with

---

[8]Adderall contains a combination of amphetamine and dextroamphetamine, which are central nervous system stimulants used to treat narcolepsy and attention deficit hyperactivity disorder ("ADHD").  See http://www.drugs.com/adderall.html (last visited Apr. 16, 2020).

subtle flattening of the dural sac and no cord compression, which Dr. Asku interpreted as DDD with no significant herniations or neural compression.  Id. at 218, 508, 516.  An MRI of the lumbar spine was also performed on March 4, 2008, revealing stable concentric bulging of the disc and spondylitic ridging with stable impingement upon the thecal sac and neural foramen at the L4-5 level, and stable right-side bulging of the disc with stable foraminal narrowing at the L5-S1 level, right greater than left.  Id. at 218, 517.  Upon examination of Plaintiff on March 6, 2008, Dr. Aksu recorded "paravertebral muscle spasms noted, especially on the right side."  Id. at 508.  On March 20, 2008, an MRI of Plaintiff's right shoulder revealed localized tendonitis of the distal anterior supraspinatus tendon.  Id. at 298.

On April 8, 2008, physiatrist Denis P. Rogers, M.D., evaluated Plaintiff on referral from Dr. Ruggiero.  Tr. at 216-19.  Plaintiff reported that he suffered neck and back injuries in a car accident in January 2006 (see supra n.7) which had never resolved but which became "markedly worse" after another car accident in November 2007.  Id. at 216.  Plaintiff took OxyIR[9] as needed with little if any relief, in addition to ibuprofen and Adderall, he reported no relief from heat or chiropractic treatment, and he stopped physical therapy because it made his symptoms worse.  Id. at 216, 217.  He reported sharp pain on the ride side of his neck into the right shoulder blade area and posterior aspect of the right shoulder, pain in the index and ring finger of his right hand with

---

[9]OxyIR is a brand name of oxycodone, an opioid pain medication.  See http://www.drugs.com/oxycodone.html (last visited Apr. 16, 2020).

radiating pain to the right side of his head, and lower back pain that radiated into both legs, much worse on the left, and weakness of both arms and of the right leg.  Id. at 216. Plaintiff described his pain as severe, between seven and ten on a ten-point scale, and limiting as to all activities.  Id. at 217.  Upon examination, Dr. Rogers noted discomfort and pain with extension and rotation of Plaintiff's neck, mild pain on abduction of the left shoulder, and discomfort, pain, and instability of the right shoulder, with positive impingement testing, tenderness over the acromioclavicular joint, and weakness of shoulder abduction bilaterally and subtle weakness of right grip strength compared to left. Id. at 217-18.  Examination of Plaintiff's lumbar spine revealed extension to thirty degrees with pain; pain upon rotation, right worse than left; paralumbar tenderness, right worse than left; muscle spasm on the right; and limited range of motion and painful hip rotation on the right.  Id. at 218.  Dr. Rogers listed his impressions as cervical disc disease C4-C5 to C6-C7, with disc protrusion at C6-C7 level; cervical facet dysfunction; right shoulder supraspinatus tendonitis with instability; left shoulder pain; lumbar disc disease L4-L5 and L5-S1 with paracentral contained herniation at the L5-S1 level; right sacroiliac joint dysfunction, rule out right hip labral tear.  Id. at 218.  The doctor recommended a course of lumbar epidural injections.  Id. at 219.

On May 31, 2008, following Plaintiff's third car accident, a CT scan of Plaintiff's brain performed at Chester County Hospital was unremarkable, with no evidence of intracranial hemorrhage.  Tr. at 233.  The next day, a cervical spine CT scan revealed no evidence of fracture, a small central/left central disc protrusion at C5-C6, and no

foraminal narrowing or facet arthrosis.  Id. at 226.  Plaintiff exhibited muscle spasm and decreased range of motion of the lower back.  Id. at 230.

Dr. Ruggiero continued to see Plaintiff approximately once per month to oversee his pain management, consistently noting symptoms and limitations related to Plaintiff's back, neck and shoulder injuries.  For example, Plaintiff exhibited decreased range of motion of the right shoulder on November 24 and December 22, 2008 (tr. at 445), decreased range of motion of the right shoulder and spasm and tenderness of the cervical and lumbar regions on January 9, 2009 (id. at 444), and decreased range of motion in the shoulder on January 27, 2009.  Id. at 443.

On December 19, 2008, on referral from Dr. Ruggiero, orthopedist Charles J. Odgers IV, M.D., evaluated Plaintiff primarily for complaints of shoulder pain.  Tr. at 296, 299.  At the time Plaintiff was being prescribed oxycodone, ketoprofen, citalopram, and Ativan.  Id. at 299.[10]  Following an examination and review of diagnostic studies, Dr. Odgers diagnosed Plaintiff with right shoulder arthropathy and administered a steroid injection.  Id. at 301.  A further injection was performed during a follow-up appointment three weeks later.  Id. at 302.

On January 15, 2009, A. Cuazzo, M.D., performed a consultative examination of Plaintiff.  Tr. at 305-15.  Plaintiff was confused and drowsy from medications he took

---

[10]Ketoprofen is used to treat pain or inflammation from arthritis.  See http://www.drugs.com/ketoprofen.html (last visited Apr. 16, 2020).  Citalopram (brand name Celexa) is used to treat depression.  See http://www.drugs.com/ctalopram.html (last visited Apr. 16, 2020)  Ativan (generic lorazepam) is used to treat anxiety disorders.  See http://www.drugs.com/ativan.html (last visited Apr. 16, 2020).

prior to the examination, which he identified as an extra lorazepam pill.  Id. at 305, 306.

Plaintiff exhibited grossly normal range of motion, and intact gait, station, neurological

status, and sensory and motor skills.  Id. at 310.  Dr. Cuazzo's impressions included

degenerative joint disease ("DJD") of the cervical spine from C4 to C7; lumbar disc DDD

from L4 to S1; right shoulder supraspinatus tendonitis; status post-chronic pain syndrome

related to Plaintiff's November 2007 motor vehicle accident; and depression by history

and medication treatment.  Id. at 310-11.  In a medical source statement completed on the

same day, Dr. Cuazzo opined that Plaintiff could occasionally lift and carry up to twenty-

five pounds, could occasionally perform all postural movements, and was not otherwise

limited.  Id. at 314-15.

On February 4, 2009, Philip Adelman, M.D., of Neuro Care Associates, evaluated

Plaintiff on referral from Dr. Ruggiero.  Tr. at 320-21.  Plaintiff indicated that his

symptoms had become "much worse" since the May 2008 car accident, with worsening

neck, mid-back and low-back pain.  Id. at 320.  Plaintiff's medications included

oxycodone, ketoprofen, Ativan, Celexa, and atenolol.  Id.[11]  Upon examination, Plaintiff

exhibited mild to moderately limited flexion, extension, and rotation of his neck; various

degrees of tenderness in his neck, shoulder, and back; diminished mobility of the right

shoulder; and positive straight-leg raising on the right.  Id. at 321.  Dr. Adelman's

impression was that Plaintiff had a chronic pain syndrome, with enhanced neck and

shoulder pain and radiating abnormal sensations since his May 2008 car accident.  Id.

---

[11]Atenolol is a beta-blocker used to treat angina and hypertension.  See
http://www.drugs.com/atenolol.html (last visited Apr. 16, 2020).

The doctor requested a repeat MRI of the cervical spine, as well as EMG studies of the upper extremities.  Id.  The subsequent EMG demonstrated mild right CTS and mild chronic neurogenic change consistent with chronic C5 radiculopathy.  Id. at 316.  On February 27, 2009, Dr. Adelman opined that Plaintiff had localized right shoulder pathology, right upper extremity sensations due to CTS, and chronic pain syndrome.  Id.

On March 19, 2009, Plaintiff returned to Dr. Ruggiero with complaints of neck and mid-back pain, right shoulder pain, and radiculopathy, following a fourth car accident the previous night.  Tr. at 441.  Physical examination noted spasm in the right shoulder with decreased range of motion in the cervical spine.  Id.  The doctor diagnosed acute cervical strain and prescribed oxycodone, rest, and heat.  Id. at 442.  Subsequent treatment notes by Dr. Ruggiero indicate right shoulder pain, decreased range of motion in the right shoulder, cervical spine and lumbar spine, and spasm in the lumbosacral and cervical regions, on April 24, 2009 (id. at 440), and lumbosacral spasm and decreased range of motion in the right shoulder on June 18, 2009.  Id. at 438.

On May 6, 2009, non-examining physician Carla Huitt, M.D., completed an RFC assessment of Plaintiff.  Tr. at 369-78.  Dr. Huitt listed Plaintiff's primary diagnoses as DDD/DJD of the lumbar/cervical spine, with secondary diagnoses of right shoulder tendonitis, mild right CTS, and mild C5 radiculopathy.  Id. at 369.  Dr. Huitt opined that Plaintiff could occasionally lift/carry up to fifty pounds and frequently lift/carry up to twenty-five pounds; could stand and/or walk and sit for up to six hours each in an eight-hour workday; and had unlimited ability to push/pull.  Id. at 370.  Plaintiff had no

postural, manipulative, visual or communicative limitations, and no environmental limitations except that he should avoid hazards.  Id. at 371-72.

Dr. Ruggiero referred Plaintiff to Andre O. Williams, M.D., a pain management specialist.  On May 26, 2009, Dr. Williams noted that Plaintiff had undergone conservative treatment for longstanding complaints of cervical, right shoulder, and upper extremity pain, without successful resolution, although injections had provided relief for shoulder pain.  Tr. at 398-99.  On June 15, 2009, Dr. Williams recommended non-narcotic medication and started Plaintiff on Ultram,[12] and advised him to "tough it out" when his pain mild-to-moderate level.  Id. at 397.  In July 2009, after Plaintiff informed Dr. Williams' office that he stopped taking Ultram and sought narcotics, id. at 402, Dr. Ruggiero indicated that he would start Plaintiff on Savella[13] and oxycodone, would see Plaintiff weekly, and would be responsible for prescribing all of his medication.  Id. at 401.

On September 14, 2009, rheumatologist Michael Jaworski, M.D., examined Plaintiff on referral from Dr. Williams.  Tr. at 554-56.  Dr. Jaworski noted Plaintiff's diagnostic findings and opined that, although his symptoms could be due to degenerative changes or changes sustained in his multiple car accidents, it would be "worthwhile" to evaluate him for an inflammatory arthritic condition.  Id. at 554.  On October 12, 2009,

---

[12]Ultram (generic tramadol) is a narcotic-like painkiller used to treat moderate to severe pain.  See http://www.drugs.com/ultram.html (last visited Apr. 16, 2020).

[13]Savella is a serotonin-norepinephrine reuptake inhibitor used to treat myalgia. See http://www.drugs.com/savella.html (last visited Apr. 16, 2020).

after reviewing laboratory studies, Dr. Jaworski informed Plaintiff that he saw no evidence of an underlying inflammatory arthritis. Id. at 550.

On October 19, 2009, Dr. Ruggiero diagnosed Plaintiff with post-traumatic fibromyalgia. Tr. at 434. On November 12, 2009, after again observing spasm and decreased range of motion in Plaintiff's cervical and lumbar spines, the doctor diagnosed chronic spinal pain and post-traumatic fibromyalgia. Id. at 433. In February 2010, Dr. Ruggiero noted Plaintiff's diagnoses to include chronic pain and fibromyalgia. Id. at 432.

On June 3, 2010, Dr. Ruggiero completed a medical assessment of Plaintiff's ability to perform work-related activities. Tr. at 447-51. Dr. Ruggiero indicated that Plaintiff experienced injury to his shoulders and lumbar region on January 7, 2007, further injury to the shoulder and lumbar region, as well as his neck, on November 12, 2007, and further unidentified injuries on December 29, 2009. Id. at 447.[14] The doctor opined that in an eight-hour workday with the option to change position as needed, Plaintiff could sit for a total of one -to- two hours, stand for a total of one -to- two hours, and walk for a total of two hours. Id. He further opined that Plaintiff could sit for one hour at a time and stand or walk for thirty minutes at a time. Id. In support of these limitations, Dr. Ruggiero indicated that Plaintiff had persistent cervical and lumbar pain, with right lower-extremity pain and spasms. Id. He opined that Plaintiff should elevate his legs as needed to alleviate back pain, could lift twenty-five pounds occasionally but

---

[14]The onset dates appear to refer to Plaintiff's motor vehicle accidents, although they do not precisely match the dates contained elsewhere in the record.

could not lift any amount of weight on a frequent or continuous basis due to pain, and that use of his hands and feet was limited due to radicular pain on his right-side extremities, which is aggravated by repetitive use.  Id. at 448.[15]  Dr. Ruggiero indicated that Plaintiff was totally precluded from bending/stooping, kneeling, crawling, crouching/squatting, climbing ropes, and handling large objects, and could occasionally reach bilaterally, climb stairs, twist/turn, and finger small objects, left better than the right.  Id. at 448-49.  The doctor explained that these limitations were again attributable to spasms and reduced range of motion in Plaintiff's spine and shoulders.  Id. at 449.  When asked to provide information concerning the pain exhibited by Plaintiff during examinations or treatment, Dr. Ruggiero indicated that Plaintiff had pain in his neck, shoulders, back and right leg, eight out of ten in intensity and continuous, which was aggravated by weightbearing, prolonged sitting, prolonged standing, and lifting/carrying.  Id. at 450.  Dr. Ruggiero opined that Plaintiff's condition and impairment would "probably not" improve, explaining that he experienced three car accidents which each aggravated his spinal and shoulder issues, and that "[h]e developed post-traumatic fibromyalgia which is now permanent."  Id. at 451.

On July 24, 2010, Morris Kliger, D.O., reviewed Dr. Ruggiero's records to determine the reasonableness of Plaintiff's treatment regimen following his March 18, 2009 motor vehicle accident.  Tr. at 1401-04.  Dr. Kliger noted that Plaintiff "had been treating for injuries to his cervical, thoracic, lumbar spine and shoulders including

---

[15]The form defines "occasionally" as "1-32% of the time," and "frequently" as "33-65% of the time."  Tr. at 448.

herniated cervical and lumbar discs with radicular symptoms for which he was
significantly symptomatic up until the time of the March 18, 2009 accident." Id. at 1402.
However, the doctor concluded that due to a lack of appropriate and necessary
documentation, treatment by Dr. Ruggiero for Plaintiff's soft tissue injuries related to the
March 18, 2009 accident could only be supported for a twelve-week period.  Id. at 1403-
04.

On January 2, 2014, Dr. Ruggiero saw Plaintiff and completed another medical
assessment of his ability to perform work-related activities.  Tr. at 1428-32.  The doctor
opined that in an eight-hour workday, Plaintiff could sit for a total of three hours, and
stand and walk for a total of one hour each, and that he needed to change positions every
thirty minutes.  Id. at 1428.  In support of these limitations, Dr. Ruggiero indicated that
Plaintiff had pain/spasm in his lumbar spine and right hip, decreased range of motion, and
spasm in his cervical spine with radicular pain to his shoulders.  Id.  The doctor opined
that Plaintiff was medically required to recline and elevate his legs for one hour per day,
and that he could not lift any weight due to herniated lumbar discs and chronic shoulder
and cervical pain.  Id. at 1429.  He was limited to pushing/pulling for one hour in an
eight-hour workday, limited to five pounds and with no repetitive use, and he was totally
precluded from all postural activities except climbing stairs, which he could do when
needed.  Id. at 1429-30.  When asked to provide information concerning the pain
exhibited by Plaintiff during examinations or treatment, Dr. Ruggiero indicated that
Plaintiff had neck pain that radiated into his shoulders, right more than left, six out of ten
in intensity and constant with motion, and that the pain was aggravated by movement of

his neck, back, and shoulders.  Id. at 1431.  The doctor identified chronic cervical/lumbar disc disease and chronic post-traumatic fibromyalgia as the medically determinable impairments causing Plaintiff's pain, explaining that his symptoms have worsened over the past two years related to multiple injuries, and that his chronic fibromyalgia is exacerbated by most activities.  Id. at 1431, 1432.

On January 23, 2018, Darius Ghazi, M.D., a non-examining source, completed a medical source statement regarding Plaintiff's ability to do work-related activities (physical).  Tr. at 1853-62.[16]  Dr. Ghazi opined that Plaintiff met the criteria for Listing 1.04A due to radiculopathy to the arm and leg, and that he had done so since November 2007.  Id. at 1853.

### C.   Other Evidence

At the October 5, 2017 administrative hearing, Plaintiff testified that he has not been able to work full-time since his alleged onset date in 2006, and that he performed "odd jobs" in a part-time or under-the-table capacity, including flooring work for his uncle and light landscaping.  Tr. at 658-59, 666.  He explained that he was unable to do any kind of full-time work between his injury in 2006 and 2014 due to physical problems such as lower back, shoulder and neck pain and spasms, and mental problems including depression, anxiety, and Attention Deficit Disorder ("ADD").  Id. at 658-59.  Plaintiff

---

[16]Although the form requested that Dr. Ghazi consider only the period from June 1, 2009, through June 27, 2014, see tr. at 1855, he repeatedly supported his assessments with reference to Plaintiff's stroke.  Id. at 1854, 1855, 1857, 1858.  Because the stroke occurred on June 27, 2014, see id. at 1474, it cannot be said with confidence that Dr. Ghazi's assessments apply to the closed period prior that date.

stated, "I have so many disorders it just -- everything is so overwhelming.  I tend to fly off the handle a lot."  Id. at 659.  He explained that he had done physical labor his whole life, and that "due to the severity of the accidents I was involved in, I've been . . . unable to return to that type of labor."  Id. at 660.

Plaintiff testified that during the time when his doctors were performing diagnostic tests following his motor vehicle accidents, Dr. Odgers performed a series of injections in his shoulders, which helped but ended when insurance refused to pay for them.  Tr. at 660.  Plaintiff also attended physical therapy, but he stopped when the problems worsened.  Id. at 661.  He testified that Dr. Ruggiero diagnosed him with fibromyalgia during the relevant period, and referred him to a rheumatologist.  Id. at 661-62.  Plaintiff reported that the condition causes chronic pain in his lower back, back, shoulder, neck, right leg and kneecap, which is constant and continues despite prescription pain medication, getting "worse with time."  Id. at 662, 664-65.  He received mental health treatment before and after the closed period at issue, and Dr. Ruggiero prescribed medication for his mental conditions during the relevant period.  Id. at 661, 665.

Plaintiff testified that his minor son lives with him only on weekends.  Tr. at 659.[17]  Plaintiff has a driver's license and can drive.  Id. at 657-58.  He stated that before his stroke in 2014, he could take care of himself, perform basic household chores such as

---

[17]The precise timeline is difficult to discern, but it appears that Plaintiff lived together with his son and his son's mother for only a brief part of the relevant period. Plaintiff's son was twelve years old at the time of the October 5, 2017 administrative hearing, tr. at 659, and Plaintiff testified that he and the mother split when his son was "maybe two."  Id. at 660.

laundry, and prepare meals.  Id. at 662.  He had difficulty walking at that time, with

"severe spasms" in his lower back after standing for fifteen or twenty minutes, and back

spasms while sitting that caused his leg to lock up "like a Charley horse."  Id. at 662-63.

He could stand, but the back spasms would occur, as well as fluid build-up in his lower

extremities.  Id. at 663.[18]

A VE also testified at Plaintiff's October 5, 2017 administrative hearing.  Tr. at

667-74.  The ALJ asked the VE to consider a hypothetical individual of Plaintiff's age,

education, and work experience who would be able to perform a range of sedentary work,

with occasional overhead reaching bilaterally, frequent in other directions; no crawling or

climbing ladders, ropes or scaffolds; occasional stooping, crouching, kneeling, climbing

ramps and stairs; no exposure to unprotected heights or moving mechanical parts; and

limited to simple, routine tasks, with few to no workplace changes, no contact with the

---

[18]Plaintiff's testimony from the October 5, 2017 hearing is largely consistent with
the testimony he provided in his earlier hearings.  See tr. at 36-105 (06/16/10 hearing),
718-54 (01/10/14 hearing), 680-717 (10/27/15 hearing).  For example, he testified each
time that motor vehicle accidents aggravated pre-existing conditions and caused constant
pain and muscle spasms in his lower back, as well as muscle and/or joint pain in his neck,
shoulders, back, hips, and lower extremities, and that the pain and spasms limited his
ability to walk, stand and sit during the relevant period.  Id. at 48, 57-58 (06/16/10
hearing), 727, 729-31 (01/10/14 hearing), 694-95, 696-97 (10/27/15 hearing).

Plaintiff's October 5, 2017 testimony is also largely consistent with a Function
Report and Supplemental Function Questionnaire completed by Plaintiff on December
14, 2008.  Tr. at 191-200.  Plaintiff described being in constant pain, with pain and aches
throughout his body, id. at 191-92, and indicated that he could perform household tasks
depending on how he feels.  Id. at 191, 193.  He indicated that his pain and related
symptoms affect his physical ability to lift, squat, bend, stand, reach, walk, sit, kneel,
climb stairs, and use his hands, as well as his ability to concentrate, remember, and
complete tasks.  Id. at 196.  Plaintiff listed his medications as oxycodone, ibuprofen,
ketoprofen, and Adderral, and stated that pain medications relieve his pain for an hour or
two.  Id. at 200.

general public, and occasional interaction with co-workers or supervisors.  Id. at 670-71.
The VE responded that the limitations precluded Plaintiff's past relevant work, but that
other work existed that such a person could perform, including surveillance system
monitor, envelope addresser, and lens inserter.  Id. at 671-72.  In response to questions
from Plaintiff's counsel incorporating the limitations contained in Dr. Ruggiero's two
functional assessments, the VE testified that Plaintiff would be precluded from full-time
work.  Id. at 672, 673.

### D.   Consideration of Plaintiff's Claims

#### 1.   Consideration of Medical Opinion Evidence

Plaintiff first claims that the ALJ rejected medical opinion evidence from Drs.
Ruggiero and Ghazi without reasonable explanation.  Doc. 11 at 4-11; Doc. 17 at 1-4.
Defendant counters that the ALJ's consideration of the medical opinion evidence is
supported by substantial evidence.  Doc. 16 at 3-8.

A treating physician's opinion is entitled to controlling weight when it "is well-
supported by medically acceptable clinical and laboratory diagnostic techniques and is
not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. §§
404.1527(c)(2), 416.927(c)(2).[19]  A treating physician's opinion is entitled to be given
greater weight than that of a physician who conducted a one-time examination of the

---

[19]Effective March 27, 2017, the Social Security Administration amended the rules
regarding the evaluation of medical evidence, eliminating the assignment of weight to
any medical opinion.  See Revisions to Rules Regarding the Evaluation of Medical
Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017).  Because Plaintiff's applications were filed
prior to the effective date of the new regulations, the opinion-weighing paradigm is
applicable.

claimant as a consultant.  See, e.g., Adorno v. Shalala, 40 F.3d 43, 47-48 (3d. Cir. 1994)

(citing Mason v. Shalala, 994 F.2d 1058, 1067 (3d. Cir. 1993)).  When there is a conflict

in the evidence, the ALJ may choose which evidence to credit and which evidence not to

credit, so long as he does not "reject evidence for no reason or for the wrong reason."

Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005); Plummer v. Apfel, 196 F.3d

422, 429 (3d Cir. 1991); see also 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4)

("Generally, the more consistent an opinion is with the record as a whole, the more

weight we will give to that opinion.").  When a treating physician's opinion is not

accorded controlling weight, the ALJ should consider a number of factors in determining

how much weight to give it; the examining relationship (more weight accorded to an

examining source), the treatment relationship (including length and nature of the

treatment relationship), supportability, consistency, specialization, and other factors.  Id.

§§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6).

      In discussing Dr. Ruggiero's opinion evidence, the ALJ stated the following:

> Dr. Ruggiero's medical assessment dated June 3, 2010, is
> given partial weight, as it is not fully supported by medical
> evidence or a relevant explanation.  There are no objective
> findings documented in the doctors notes to justify this level
> of debilitation, especially the restriction of sitting 1-2 hours
> total, standing 1-2 hours total, walking 1 hour total,
> frequently lifting/carrying zero pounds, inability to use the
> right upper and lower extremities to push/pull, inability to
> handle large objects, and only occasional ability to finger
> small objects.  Nowhere in Dr. Ruggiero's notes does he
> recommend reclining or elevating legs, and no other treating
> source has recommended same.  Dr. Ruggiero indicates he
> bases his opinion on pain, which is a subjective complaint,
> spasm and decreased range of motion, but those are not
> supported by objective examination findings in his records.

> Additionally, if [Plaintiff] were as disabled as Dr. Ruggiero
> says, one would expect him to be a surgical candidate.
> Moreover, this assessment seems inconsistent with
> [Plaintiff's] activities of daily living, including driving,
> feeding the family cat, doing some laundry and minor repairs,
> shopping in stores, caring for his young son, and taking care
> of his father and brother when they were ill.  Yet, some
> weight is given to the assessment that [Plaintiff] can
> occasionally climb stairs, as that is reasonable in light of
> findings of normal gait, full motor strength, and intact
> sensation in the lower extremities, as well as [DDD] on
> MRIs. . . .

Tr. at 635 (exhibit citations omitted).

I find that the ALJ's consideration of the medical opinion evidence is flawed for

several reasons.  First and most obviously, Dr. Ruggiero has been treating Plaintiff since

January 14, 1998, tr. at 1428, and therefore his opinions reflect a lengthy longitudinal

perspective unlike any other physician of record -- one which predates Plaintiff's first car

accident, and which was based on roughly monthly appointments during the entire closed

period at issue.  In addition to his own personal observations and examinations of

Plaintiff, Dr. Ruggiero had the benefit of diagnostic testing performed on Plaintiff

following each of his car accidents, as well as assessments and diagnostic tests performed

in connection with referrals to multiple other physicians, including orthopedists (Drs.

Aksu and Odgers), a physiatrist (Dr. Rogers), a neurologist (Dr. Adelman), and a pain

management specialist (Dr. Williams).  It is also significant that the June 3, 2010

assessment made by Dr. Ruggiero is broadly consistent with a subsequent assessment the

doctor made on January 2, 2014, indicating that his opinions regarding the limiting

effects of Plaintiff's chronic pain continued despite treatment including narcotic and non-

narcotic pain medication, injections of his shoulder, and attempted physical therapy.

Given this intimate and long-term treatment history -- and given multiple remands which

had already occurred in the case -- the most recent ALJ should have obtained clarification

from the doctor regarding the bases of his assessment, if he found it to be inconsistent

with the overall medical record.  See Rosa v. Colvin, 956 F. Supp.2d 617, 621 (E.D. Pa.

June 28, 2013) ("[T]he Third Circuit 'has repeatedly emphasized that the special nature

of proceedings for disability dictates extra care on the part of the agency in developing an

administrative record and in explicitly weighing all evidence.'") (quoting Dobrowolsky v.

Califano, 606 F.2d 403, 406-07 (3d Cir. 1979)).  This is particularly true where, as here, a

full crediting of the treating physician's assessment would result in a finding of disability.

Second, the ALJ's primary reason for giving only partial weight to Dr. Ruggiero's

assessment -- "he base[d] his opinion on pain, which is a subjective complaint, spasm and

decreased range of motion, but those are not supported by objective examination findings

in his records," tr. at 635 -- is both misleading and factually incorrect.  The statement is

misleading to the extent it suggests that Dr. Ruggiero's assessment was based principally

on Plaintiff's subjective reports of pain, because the doctor repeatedly referenced

Plaintiff's spasm and limited range of motion when asked to explain the limitations

contained in his June 3, 2010 assessment, id. at 447-51, and explicitly noted in his

January 2, 2014 assessment that the limitations were not based solely on Plaintiff's

statements.  Id. at 1432.  More importantly, the ALJ's reasoning is factually incorrect

because Dr. Ruggiero's treatment notes consistently documented spasm and reduced

range of motion.  See, e.g., id. at 445 (decreased range of motion on 11/24/08 &

12/22/08), 444 (spasm and tenderness of cervical and lumbar regions and decreased range of motion of the right shoulder on 01/09/09), 443 (decreased range of motion in shoulder on 01/27/09), 441 (spasm with decreased range of motion in the cervical spine on 03/19/09), 440 (decreased range of motion in the right shoulder, cervical spine and lumbar spine on 04/24/09), 438 (lumbosacral spasm and decreased motion in shoulder on 06/18/09), 433 (spasm and decreased range of motion in the cervical and lumbar spines on 11/12/09), 429 (spasm in the shoulder).  Moreover, spasm and decreased range of motion is also documented elsewhere in the record.  See, e.g., id. at 510 (Dr. Aksu – spasm and tenderness of the lumbar spine on 03/03/08), 508 (Dr. Aksu – paravertebral muscle spasm on 03/06/08), 218 (Dr. Rogers – muscle spasm and decreased range of motion on 04/08/08), 230 (Chester Co. Hospital – spasm and decreased range of motion in lower back on 06/01/08).  Because repeated objective examination findings document the presence of spasm and impaired range of motion, the ALJ's rejection of Dr. Ruggiero's opinion on this basis constitutes error.  Rutherford, 399 F.3d at 554; Plummer, 196 F.3d at 429.

Third, the ALJ rejected aspects of Dr. Ruggiero's assessment by making improper lay medical judgments.  For example, the ALJ's statement, "if [Plaintiff] were as disabled as Dr. Ruggiero says, one would expect him to be a surgical candidate," is improper.  Dr. Ruggiero employed a wide range of conservative treatment in attempting to ameliorate Plaintiff's pain and physical impairments, including pain medication, chiropractic care, physical therapy, and injections, and although these efforts did not result in significant improvement, Dr. Ruggiero did not recommend that Plaintiff undergo surgery -- a

treatment decision consistent with those of the specialists who assessed Plaintiff, none of whom recommended him for surgery despite various diagnoses.  The ALJ's substitution of his medical judgment in this regard is troublesome because this not a case where Plaintiff failed to follow a recommended course of surgical intervention.  See Walker v. Barnhart, 172 Fed. App'x 423, 427 n.2 (3d Cir. 2006) ("[A]n individual, who has a disabling impairment that is amenable to prescribed treatment which could be expected to restore his ability to work, cannot be found 'disabled' if he willfully fails to follow such prescribed treatment.") (citations omitted).  The ALJ's statement also incorrectly implies that all pain-producing orthopedic and/or degenerative conditions are amenable to surgery, when decisions regarding treatment, including surgery, are best left to trained medical professionals familiar with a particular patient.  See, e.g., Burnett v.Comm'r of Soc. Sec., 220 F.3d 112, 123 (3d Cir. 2000) (remanding for further consideration where claimant had osteoarthritis in knee and DDD, received pain medication and PT, and medical evidence included note that surgery was not recommended); see also Lapierre-Gutt v Astrue, 382 Fed. App'x 662, 664 (9th Cir. 2010) (questioning whether powerful pain medication and injections constitutes conservative treatment, and noting claimant with DDD, post-surgical fusion, and fibromyalgia cannot be discredited where "the record does not reflect that more aggressive treatment actions are appropriate") (citations omitted).  In short, the ALJ improperly relied on his own opinion that Plaintiff's symptoms, if true, would have required surgery.

Additionally, the fact that Plaintiff retained the ability to engage in basic activities around the house, and to drive and care for his son on weekends, does not necessarily

undermine a conclusion regarding the limiting effects of Plaintiff's severe and non-severe impairments, including his pain and physical limitations, nor did the ALJ explain how any of Plaintiff's activities were inconsistent with the limitations assessed by Dr. Ruggiero.  See Fargnoli v. Massanari, 247 F.3d 34, 41 n.5 (3d Cir. 2001) ("[S]poradic and transitory activities cannot be used to show an ability to engage in substantial gainful activity.")

For the foregoing reasons, I conclude that the ALJ's rejection of Dr. Ruggiero's opinions is not supported by substantial evidence.[20]

### 2.   Consideration of Lay Witness Testimony

Plaintiff also claims that the ALJ improperly rejected the testimony of Plaintiff's father during Plaintiff's first administrative hearing on June 16, 2010.  Doc. 11 at 12-15; Doc. 17 at 4-5.  Defendant counters that the ALJ's consideration of lay witness testimony was supported by substantial evidence.  Doc. 16 at 9.

 "The ALJ has a duty to hear and evaluate all relevant evidence in order to determine whether an applicant is entitled to disability benefits."  Cotter v. Harris, 642

---

[20]Plaintiff also argues that the ALJ improperly discounted the opinion of Dr. Ghazi, who opined in response to interrogatories that Plaintiff met Listing 1.04A due to radiculopathy of the arm and leg, and that he had done so since November 2007.  Doc. 11 at 10-11; see tr. at 1853.  The ALJ gave this opinion little weight, noting that Listing 1.04A also requires evidence of nerve root compression, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss, and a positive straight-leg raising test, and that the medical evidence does not establish compromise of a nerve root or the spinal cord.  Id. at 635-36.  Because I find that the ALJ's consideration of Dr. Ruggieri's opinion evidence is not supported by substantial evidence, and that it is appropriate to remand with direction that benefits be paid, I do not find it necessary to further address this claim.

F.2d 700, 704 (3d Cir. 1981); see also Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) ("The ALJ must consider all the evidence and give some reason for discounting the evidence she rejects.").  The "ALJ may not reject pertinent or probative evidence without explanation," Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 204 (3d Cir. 2008), because otherwise "the reviewing court cannot tell if significant probative evidence was credited or simply ignored." Cotter, 642 F.2d at 705.  Here, I note that the ALJ considered Plaintiff's father's testimony and provided explanations for why he gave it only partial weight. Tr. at 637.  However, because I find that the ALJ's consideration of the medical opinion evidence is not supported by substantial evidence, and will remand with directions that benefits be paid, I do not find it necessary to address the validity of the ALJ's explanations in this regard.

### E. __Remedy__

Plaintiff moves the court for an order directing that benefits be paid.  Doc. 11 at 15-18; Doc. 17 at 5-6.  Defendant argues that the record does not justify an award of benefits.  Doc. 16 at 10.

When reversing a Commissioner's final decision, the court "may choose to remand . . . for a further hearing or simply . . . award benefits." Podedworny v. Harris, 745 F.2d 210, 221 (3d Cir. 1984); Brownawell v. Comm'r of Soc. Sec., 554 F.3d 352, 357-58 (3d Cir. 2008).  The decision whether to award benefits rests with the court's sound discretion, Podedworny, 745 F.2d at 221, guided by certain basic principles.

> The decision to direct the district court to award benefits
> should be made only when the administrative record of the
> case has been fully developed and when substantial evidence

> on the record as a whole indicates that that the claimant is
> disabled and entitled to benefits.  When faced with such
> cases, it is unreasonable for a court to give the ALJ another
> opportunity to consider new evidence concerning the
> disability because the administrative proceeding would result
> only in further delay in the receipt of benefits.

Id. at 221-22 (internal citations omitted).  Thus, the decision to award benefits in lieu of

ordering a remand turns on whether (1) there has been an excessive delay not attributable

to the claimant, and (2) the administrative record has been fully developed and substantial

evidence indicates that the claimant was disabled during the relevant period.

The first factor, undue delay, weighs heavily in favor of an award of benefits.

Courts measure undue delay in terms of the passage of years and by reference to whether

there have been prior appeals and remands, with administrative delays of five or more

years and cases involving one or two prior remands typically triggering consideration of

an award of benefits.  See, e.g., Brownawell, 554 F.3d at 358 (eight-year delay and two

prior remands, benefits awarded); Morales v. Apfel, 225 F.3d 310, 320 (3d Cir. 2000)

(ten-year delay and two appeals, benefits awarded); Podedworny, 745 F.2d at 223 (five-

and-a-half-year delay and two appeals, benefits awarded); Halloran v. Berryhill, 290 F.

Supp.3d 307, 321 (M.D. Pa. 2017) (four-year delay, benefits awarded); Schonewolf v.

Callahan, 972 F. Supp. 277, 290 (D.N.J. 1997) (six-year delay and two prior remands,

benefits awarded).  Here, the delay in fully adjudicating Plaintiff's applications is already

more prolonged than any of these cited cases.  Plaintiff applied for benefits in September

2008, more than eleven years ago.  The Appeals Council twice remanded because an ALJ

failed to follow its remand orders, and the district court remanded an additional time on

the Commissioner's motion, resulting in four administrative hearings and four decisions
issued by three ALJs.  Despite this time and effort, the ALJ decision presently under
review, issued on April 9, 2018, is also flawed.  Under the circumstances, a remand for
further proceedings would set the stage for a fifth administrative decision, which exceeds
the numbers which have previously been deemed excessive by the courts.

The second factor -- whether the administrative record has been fully developed
and substantial evidence indicates that the claimant was disabled during the relevant
period -- also weighs in favor of an award of benefits.  This factor is met when the court
finds the record and medical opinion evidence is fully developed, see Brownawell, 554
F.3d at 358, and when the "extensive medical record, wrongly rejected by the ALJ, is
substantial evidence that [a claimant is disabled]."  Morales, 225 F.3d at 320.  Here, the
issue is whether Plaintiff was disabled during the period between June 21, 2006, and June
26, 2014, and I have previously explained why the latest ALJ opinion regarding this
period is not supported by substantial evidence, particularly in light of medical opinion
evidence from Plaintiff's longtime treating physician, Dr. Ruggiero, indicating that
Plaintiff had debilitating limitations related to the pain and other symptoms attributable to
his car accidents during the relevant period.[21]  Given the procedural history of this case, it
is unlikely that the record can be further developed as to the relevant period.  There have

---

[21]As previously noted, in an assessment dated June 3, 2010, Dr. Ruggiero opined
that Plaintiff's three car accidents each aggravated his spinal and shoulder problems, and
that he had developed disabling pain and related limitations.  Tr. at 451.  Although that
assessment post-dated Plaintiff's date last insured for purposes of DIB (March 31, 2010),
Dr. Ruggerio twice previously assessed Plaintiff with disabling levels of pain related to
the same injuries.  Id. at 433 (12/08/09) & 434 (10/19/09).

already been multiple hearings, three remands, and four ALJ decisions, and the administrative record already contains treatment notes and medical opinion evidence from the period at issue.  Accordingly, I will remand the case and direct that benefits be awarded.

**IV.**   **CONCLUSION**

The ALJ's decision to accord limited weight to the medical opinion evidence from Plaintiff's longtime treating physician, Dr. Ruggiero, is not supported by substantial evidence.  Because adjudication of this matter has been unduly delayed, and because the administrative record has been fully developed and indicates that Plaintiff was disabled during the relevant period, I will remand with instructions that benefits be paid.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MATTHEW ZWIEBEL | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| ANDREW SAUL, Commissioner of | : | NO.  19-1962 |
| Social Security | : | |

## O R D E R

AND NOW, this 30th day of April 2020, upon consideration of Plaintiff's request

for review (Doc. 11), Defendant's response (Doc. 16), and Plaintiff's reply (Doc. 17), and

after careful consideration of the administrative record (Doc. 9), IT IS HEREBY

ORDERED that:

1.  Judgment is entered REVERSING the decision of the Commissioner of
    Social Security and the relief sought by Plaintiff is GRANTED; and

2.  The matter is remanded to the Commissioner for an award of benefits.

3.  The clerk of Court is hereby directed to mark this case closed.

BY THE COURT:

/s/ ELIZABETH T. HEY

_____

ELIZABETH T. HEY, U.S.M.J.